# EXHIBIT A

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 1 of
46



# National Transportation Safety Board
# Aviation Accident Final Report

| | | | |
|---|---|---|---|
| **Location:** | Riverside, California | **Accident Number:** | WPR17FA066 |
| **Date & Time:** | February 27, 2017, 16:41 Local | **Registration:** | N1246G |
| **Aircraft:** | Cessna T310Q | **Aircraft Damage:** | Destroyed |
| **Defining Event:** | Aerodynamic stall/spin | **Injuries:** | 4 Fatal, 1 Serious |
| **Flight Conducted Under:** | Part 91: General aviation - Personal | | |

## Analysis

The airline transport pilot and four passengers planned to make a 300-nautical-mile cross-country flight in the airplane to return home. They arrived at the airport about noon and loaded their bags into the airplane. The pilot made an unsuccessful attempt to start the engines, and the occupants deplaned and waited for some time. During a second attempt to begin the flight, a ground controller informed the pilot that he was required to file an instrument flight rules (IFR) flight plan before departure. After the occupants deplaned a second time, they went to the airport terminal where the pilot asked a flight school employee to provide instructions for filing an IFR flight plan. According to the flight school employee, the pilot appeared rushed, and the passengers were anxious to complete the flight. According to the surviving passenger, after one of the other passengers started to make ground transportation arrangements, the pilot's wife insisted they would fly the passengers home. The pilot filed an IFR flight plan, and the pilot and passengers boarded the airplane for the third time.

At the time of the accident, IFR conditions prevailed at the departure airport with a visibility of 2 miles in light precipitation and mist, scattered clouds at 600 ft above ground level (agl) and an overcast ceiling at 4,200 ft agl. It could not be determined when the pilot had last flown in instrument meteorological conditions or when he had last completed an instrument competency check. However, it is likely that the pilot was not instrument current as he was unfamiliar with basic instrument flight planning procedures and had to be coached through the readback of his IFR clearance.

The airplane departed normally and entered a climb. Seconds later, the airplane entered a cloud and began a turn, at which time it began to shake violently as the stall warning horn sounded, consistent with an aerodynamic stall. The airplane descended from about 900 ft above ground level and impacted multiple residences about 1 nautical mile from the departure airport. Examination of the airframe and engines revealed no evidence of any preimpact mechanical malfunctions that would have precluded normal operation. The blades of both propellers displayed rotational damage signatures that were consistent with the engines producing power at impact.

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 2 of 46

Toxicology results indicated that the pilot was not impaired by carbon monoxide or drugs. Although the pilot's autopsy showed that he had coronary artery disease and was at increased risk of incapacitation from a cardiac event, the surviving passenger reported that the pilot was manipulating the controls during the descent to impact. Therefore, pilot impairment or incapacitation likely did not contribute to the accident. The pilot's decision to complete the flight despite the IFR weather conditions was likely driven by his own self-induced pressure, influenced by the passengers' need to return home and his wife's insistence that the departure would proceed as originally planned.

Calculations indicated that the airplane was loaded over its maximum gross takeoff weight by about 300 pounds. Additionally, the airplane's center of gravity (CG) was forward of the forward limit for its maximum gross weight. Although CGs that are forward but within the approved envelope generally result in more favorable stall characteristics, the airplane was loaded outside of published limits, and its performance under these conditions was unpredictable.

## Probable Cause and Findings

The National Transportation Safety Board determines the probable cause(s) of this accident to be:
The pilot's failure to maintain airplane control upon entering instrument meteorological conditions, which resulted in the airplane exceeding its critical angle of attack and an aerodynamic stall. Contributing to the accident was the pilot's personal pressure to complete the flight despite the weather conditions.

## Findings

| | |
|---|---|
| Aircraft | (general) - Capability exceeded |
| Personnel issues | Aircraft control - Pilot |
| Environmental issues | Personal pressure - Effect on operation |
| Aircraft | Maximum weight - Capability exceeded |

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 3 of
46

# Factual Information

## History of Flight

| | |
|---|---|
| Enroute-climb to cruise | Aerodynamic stall/spin (Defining event) |
| Uncontrolled descent | Collision with terr/obj (non-CFIT) |
| Post-impact | Fire/smoke (post-impact) |

On February 27, 2017, about 1641 Pacific standard time, a Cessna T310Q, N1246G, was destroyed when it collided with multiple residences after departure from Riverside Municipal Airport (RAL), Riverside, California. The airline transport pilot and three passengers were fatally injured; one passenger received serious injuries. The airplane was registered to the pilot who operated the airplane under the provisions of Title 14 *Code of Federal Regulations* Part 91. Instrument meteorological conditions prevailed, and an instrument flight rules (IFR) flight plan was filed for the personal cross-country flight that was destined for Norman Y. Mineta San Jose International Airport (SJC), San Jose, California.

According to the surviving passenger, she was invited by an acquaintance to fly in the airplane to southern California as both their daughters were scheduled to participate in a competition. On February 24, 2017, the group completed an uneventful flight from SJC to RAL. According to receipts and witnesses, on February 25, 2017, the pilot returned to RAL and had the airplane fully refueled; the pilot also purchased several terminal instrument procedure charts and en route low altitude charts.

The group returned to RAL about 1200 on the day of the accident and loaded the airplane with their bags. According to the surviving passenger, they boarded the airplane, and the pilot started the right engine but was unable to start the left engine. They deplaned and went into the airport terminal. After waiting for some time, they again tried to depart but had to return to the terminal. The passenger was not sure if the problem was "not being able to start the engine or the weather is bad." The surviving passenger inquired about the problem with the pilot's wife, who was also a passenger on the airplane; the wife became anxious and started to put pressure on the pilot to depart. After the surviving passenger offered to rent a car, the pilot's wife insisted that they would return to SJC in the airplane.

According to an airport operations employee, he saw the pilot and passengers walk to the airplane and then heard the pilot on the RAL ground control frequency requesting a visual flight rules (VFR) clearance to SJC. The operations employee reported that he heard an air traffic controller cancel the pilot's VFR flight plan and ask the pilot to file an IFR flight plan. The operations employee observed the pilot and passengers exit the airplane and return to the terminal.

The pilot asked an employee of a flight school that had an office in the terminal building if he could help him file an IFR flight plan. The flight school employee instructed the pilot to call "1-800-wxbrief," and the pilot wrote down the number. According to the flight school employee, the pilot appeared rushed. After the pilot left his office and exited the building, the flight school employee went into the hallway where the passengers were sitting and spoke with them. The passengers were "anxious to get home," and one of the passengers said that she needed to be at work the following morning. During this time, another passenger began making alternate transportation arrangements. The pilot then contacted a flight service station and filed an IFR flight plan.

Case: 21-50915   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 4 of
46

The pilot and passengers boarded the airplane for the third time, and the pilot started the engines and contacted the ground controller. About 1602, the pilot requested and was granted an IFR clearance to SJC; he did not read back the entire clearance and advised the ground controller that he was not familiar with the airport obstacle departure procedure. The ground controller reissued the IFR clearance, and the pilot requested to standby. About 7 minutes later, the pilot made a request to taxi for departure, and the ground controller prompted him to read back the IFR clearance. After the ground controller again reissued the IFR clearance, the pilot read back the clearance correctly.

About 1615, the ground controller issued taxi instructions, which the pilot read back incorrectly. After the controller reissued the taxi instructions slowly, the pilot read them back correctly. At 1632, while in the run-up area, the pilot read back the obstacle departure procedure correctly and subsequently advised the tower controller that he was ready for departure. The tower controller then issued holding instructions to await the airplane's IFR release, and the pilot acknowledged the communication without repeating the hold short instructions. At 1638, the pilot received a takeoff clearance from the tower controller.

The airport operations employee saw the airplane's departure and reported that, after an uneventful liftoff and initial climb, the airplane began a left turn as it entered the clouds (reported ceiling 600 ft). Radar data captured the airplane at 1639:50, just beyond the runway's midfield point at an altitude of about 1,100 ft mean sea level (msl) or about 300 above ground level (agl). At 1640:08 and at an altitude of 1,300 ft msl, the airplane turned left to a heading of 070° magnetic. The airplane maintained the same heading until radar contact was lost at 1640:27 at an altitude of 1,700 ft msl (about 900 ft agl). No distress calls were received from the pilot.

The surviving passenger recalled that the airplane shook during climb out, but she could hear the engines running continuously. The airplane entered a cloud and then began to vibrate violently as it started to descend. The vibration was accompanied by a horn sound, which the surviving passenger later identified as the airplane's stall warning horn after hearing an exemplary one. The surviving passenger reported that although she was not focused on the engines for the remainder of the flight, she did not recall any interruptions in power. Further, she observed the pilot manipulating the controls during the descent to impact.

The end of the flight was captured by a surveillance video camera located about 800 ft north of the accident site. The video showed the airplane descending rapidly towards the ground in a slight left wing-low attitude. The airplane's nose attitude could not be determined due to the quality of the video. The airplane disappeared behind a residence, immediately thereafter fire and smoke appeared.

Case: 21-50915   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 5 of 46

## Pilot Information

| | | | |
|---|---|---|---|
| Certificate: | Airline transport; Commercial; Flight instructor | Age: | 83,Male |
| Airplane Rating(s): | Single-engine land; Multi-engine land | Seat Occupied: | Left |
| Other Aircraft Rating(s): | None | Restraint Used: | Unknown |
| Instrument Rating(s): | Airplane | Second Pilot Present: | Yes |
| Instructor Rating(s): | Airplane single-engine; Instrument airplane | Toxicology Performed: | Yes |
| Medical Certification: | Class 2 With waivers/limitations | Last FAA Medical Exam: | October 13, 2016 |
| Occupational Pilot: | No | Last Flight Review or Equivalent: | |
| Flight Time: | | | |

The 83-year-old pilot held an airline transport pilot certificate with a rating for airplane single-engine land and commercial privileges for airplane multi-engine land. He also held a flight instructor certificate with ratings for airplane single-engine land, airplane multi-engine land, and instrument airplane. The pilot's most recent second-class medical certificate was issued on October 13, 2016, and included the restriction that he must wear corrective lenses. At the time of the exam, the pilot reported that he had accumulated 9,600 hours of flight experience of which 21 hours were in the previous 6 months. An excerpt of the pilot's personal flight record, which covered 2008, was furnished by the family. His most recent flight logbooks were not recovered. It could not be determined when the pilot had last flown in instrument meteorological conditions or when he had last completed an instrument competency check.

## Aircraft and Owner/Operator Information

| | | | |
|---|---|---|---|
| Aircraft Make: | Cessna | Registration: | N1246G |
| Model/Series: | T310Q Q | Aircraft Category: | Airplane |
| Year of Manufacture: | 1974 | Amateur Built: | No |
| Airworthiness Certificate: | Normal | Serial Number: | 310Q1097 |
| Landing Gear Type: | Retractable - Tricycle | Seats: | 5 |
| Date/Type of Last Inspection: | February 1, 2017 Annual | Certified Max Gross Wt.: | 5500 lbs |
| Time Since Last Inspection: | | Engines: | 2 Reciprocating |
| Airframe Total Time: | 4830.5 Hrs as of last inspection | Engine Manufacturer: | Continental Motors, Inc. |
| ELT: | Installed | Engine Model/Series: | TSIO-520 J |
| Registered Owner: | | Rated Power: | 310 Horsepower |
| Operator: | On file | Operating Certificate(s) Held: | None |

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 6 of 46

According to Federal Aviation Administration (FAA) records, the airplane was manufactured in 1974 and registered to the pilot and his wife on September 25, 2007. The airplane was powered by two Continental TSIO-520 J, turbocharged, direct-drive, air-cooled, 310-horsepower engines. A review of the airplane's maintenance logbooks revealed that the most recent annual inspection was completed on February 1, 2017, at an accumulated flight time of 4,830 hours. At the time of annual inspection, both the left and right engines had accrued about 1,265.1 flight hours since their most recent overhauls.

The airplane was equipped with two main wing fuel tanks with a total capacity of 102 gallons and two auxiliary wingtip tanks with a total capacity of 63 gallons. According to a fuel station attendant who worked for the fixed base operator at RAL, on February 25, 2017, he fueled the airplane at the pilot's request. The attendant topped off each of the airplane's four fuel tanks adding a total of 54 gallons of 100LL aviation gasoline. A fuel sample taken by an FAA inspector from the fuel truck that was used to refuel the airplane did not show any evidence of water or debris contamination.

Weight and Balance

An airplane weight and balance estimate was computed using occupant weights from the autopsy reports and from the surviving passenger. The baggage weight was determined by weighing an assortment of personal effects and baggage recovered from the accident site. The computed total weight was 5,812 pounds (lbs), which was 312 lbs over the airplane's maximum allowable gross weight of 5,500 lbs. The manufacturer does not provide center of gravity (CG) limits for weights above gross weight; the computed CG of 36.82 inches was forward of the forward limit of 38.67 inches at gross weight. Figure 1 shows the airplane weight and balance estimate plotted on the manufacturer's published CG moment envelope diagram from the pilot's operating handbook (POH).

WPR17FA066
Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 7 of
46



Figure 1 - Airplane Center of Gravity Moment Envelope Plotted with Main & Auxiliary Tanks at Full Capacity

According to the FAA Airplane Flying Handbook (FAA-H-8083-3B), the flight characteristics of a multi-engine airplane will vary significantly with shifts of the CG within the approved envelope. At forward CGs within the envelope, the airplane will be more stable, with a slightly higher stalling speed, a slightly lower cruising speed, and favorable stall characteristics. However, the airplane's performance outside the performance envelope cannot be predicted.

Stall Characteristics

According to the POH, the airplane's stall speed was 75 knots with no bank and 78 knots with 20° of bank.

Fuel Consumption

Climb and endurance performance computations performed using the airplane POH indicated that the airplane would have burned about 12 gallons of fuel during a climb to 12,000 ft, which was the pilot's filed cruising altitude, and contained enough fuel to fly about 790 nautical miles (nm) at the pilot's reported cruise airspeed of 160 kts. The distance from RAL to SJC was about 300 nm.

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 8 of
46

# Meteorological Information and Flight Plan

| | | | |
|---|---|---|---|
| Conditions at Accident Site: | Instrument (IMC) | Condition of Light: | Day |
| Observation Facility, Elevation: | RAL,818 ft msl | Distance from Accident Site: | 1 Nautical Miles |
| Observation Time: | 16:37 Local | Direction from Accident Site: | 270° |
| Lowest Cloud Condition: | Scattered / 600 ft AGL | Visibility | 2 miles |
| Lowest Ceiling: | Overcast / 4200 ft AGL | Visibility (RVR): | |
| Wind Speed/Gusts: | / | Turbulence Type Forecast/Actual: | / |
| Wind Direction: | | Turbulence Severity Forecast/Actual: | / |
| Altimeter Setting: | 29.81 inches Hg | Temperature/Dew Point: | 11°C / 11°C |
| Precipitation and Obscuration: | Moderate - None - Mist | | |
| Departure Point: | RIVERSIDE, CA (RAL ) | Type of Flight Plan Filed: | IFR |
| Destination: | SAN JOSE, CA (SJC ) | Type of Clearance: | IFR |
| Departure Time: | 16:40 Local | Type of Airspace: | |

In the hours before the accident, IFR conditions prevailed at RAL due to low visibilities and ceilings. A review of the RAL weather observations indicated that rain began at 1152 and continued through 1653, with very light precipitation and mist about the time of the accident. Review of weather radar imagery showed that a small area of precipitation associated with very light intensity echoes was present at 1640 immediately north of the accident site.

The 1600 recorded weather observation at RAL included wind calm, visibility 2 miles in light rain and mist, ceiling overcast at 700 ft agl, temperature and dew point 11°C, and an altimeter setting of 29.83 inches of mercury.

The 1637 recorded weather observation at RAL included wind calm, visibility 2 miles in light rain and mist, scattered clouds at 600 ft agl, overcast ceiling at 4,200 ft agl, temperature and dew point 11°C, and an altimeter setting of 29.82 inches of mercury.

A terminal aerodrome weather forecast for Ontario International Airport (ONT), Ontario, California, located about 10 nm southeast of RAL, was issued at 1302 and was valid for a 27-hour period beginning at 1300. The forecast valid for the time of the accident expected marginal VFR conditions to prevail with light and variable winds at 4 knots or less, visibility of 5 miles in light rain showers and mist, with scattered clouds at 1,500 ft agl, and a ceiling broken at 2,500 ft. The next scheduled forecast for ONT was issued at 1537 and continued to expect marginal VFR conditions to prevail with light and variable winds, visibility 3 miles in light rain and mist, with a ceiling overcast at 1,000 ft agl.

Records obtained from a private industry flight service station indicated that when the pilot filed his IFR flight plan, he was in possession of adverse weather information indicating that he had already acquired the information through personal means. The pilot's personal weather source was not determined.

WPR17FA066

Case: 21-50915     Doc# 5-4     Filed: 07/09/21     Entered: 07/09/21 14:20:02     Page 9 of 46

## Airport Information

| | | | |
|---|---|---|---|
| Airport: | RIVERSIDE MUNI RAL | Runway Surface Type: | |
| Airport Elevation: | 818 ft msl | Runway Surface Condition: | Unknown |
| Runway Used: | | IFR Approach: | None |
| Runway Length/Width: | | VFR Approach/Landing: | None |

## Wreckage and Impact Information

| | | | |
|---|---|---|---|
| Crew Injuries: | 1 Fatal | Aircraft Damage: | Destroyed |
| Passenger Injuries: | 3 Fatal, 1 Serious | Aircraft Fire: | On-ground |
| Ground Injuries: | N/A | Aircraft Explosion: | None |
| Total Injuries: | 4 Fatal, 1 Serious | Latitude, Longitude: | 33.953887, -117.418609 |

The accident site was located in a residential area about 1 nm northeast of RAL at an elevation of about 800 ft. The initial impact point (IIP) was identified by a broken chimney and a section of airframe located on the roof of house No. 1 (H-1 in the wreckage diagram located in the NTSB public docket). Multiple airplane fragments were found along the debris path, which was oriented on a heading of about 345° magnetic. House No. 2 (H-2) was located about 50 ft from the IIP and was consumed by postcrash fire. The airplane's main wreckage was found in a bedroom on the southwest end of house No. 3 (H-3) about 100 ft from the IIP. The main wreckage was comprised of the cabin, both engines, portions of the left and right wings, and the left propeller, which was underneath the main wreckage, which was consumed by postcrash fire.

The aileron flight controls were traced from the control column to the right-wing bell crank, where the cables had separated. Both push/pull tubes were continuous from the right-wing bell crank to the right aileron. Left aileron continuity was traced from the cockpit to the left-wing root where the cable had separated and displayed signatures consistent with overload separation. An intermediate segment of left aileron control cable was not recovered. The push/pull tubes remained attached to the bell crank but had separated from the left aileron.

Rudder control was traced from the rudder pedals to the aft fuselage, where the rudder cables had been cut by recovery personnel. The remaining cables were traced from the forward empennage to the rudder bell crank. Elevator control was confirmed from the cockpit to the elevator push/pull tubes, which had separated from both elevator control surfaces. The flap system was continuous from the flap chain to the right- and left-wing bell cranks. Measurement of the elevator trim tab actuator showed that about 1.75 inches of the rod was exposed, consistent with 5° tab up deflection.

The left engine's crankshaft rotated freely, and the valves moved normally with the exception of the

exhaust valve on cylinder No. 6, which had sustained crush damage. Thumb compression was achieved on all cylinders in firing order with the exception of cylinder No. 6. A borescope inspection revealed no mechanical deformation on the valves, cylinder walls, or internal cylinder heads. The spark plug center electrodes were elliptical in shape, which corresponded to worn out normal according to the Champion Aviation Check-A-Plug AV-27 Chart. Both magnetos sustained thermal damage; the left magneto was charred, and two posts were partially consumed by postcrash fire. The right magneto produced spark at all posts when rotated with a power tool. The wet vacuum pump vanes were intact and moved freely when the rotor was operated by hand. The oil sump and oil pickup tube exhibited vertical crush damage, and the pickup tube was clean and open. The oil filter sustained thermal damage and did not show any contamination within the folds. Both the oil pump gears and internal housing were unremarkable.

The engine-driven fuel pump drive gear was undamaged; the internal components were unremarkable; and the pump rotated freely by hand. The fuel distributor valve's rubber diaphragm was thermally damaged, and the valve's screen was clean.

The right engine's crankshaft rotated freely, and the valves moved normally. A borescope inspection revealed no mechanical deformation on the valves, cylinder walls, or internal cylinder heads. The spark plug center electrodes were elliptical in shape and gray in color, consistent with worn out normal according to the Champion Aviation Check-A-Plug AV-27 Chart. Both magnetos sustained thermal damage and could not be tested. The wet vacuum pump vanes were intact and moved freely when the rotor was operated by hand. The oil sump was not breached and contained a sludge in the bottom with visible magnetic particles. The oil sump screen appeared undamaged; the governor screen was clean; and the oil filter did not display any visible contaminants within the folds. The engine-driven fuel pump drive gear was undamaged; the internal components were unremarkable; and the pump rotated freely by hand. The fuel distributor valve's rubber diaphragm was partially consumed by fire, and the visible portions of the screen were clean.

Cabin Heater Examination

Examination of the cabin heater assembly showed that the unit's outer shroud was damaged by postcrash fire. The heater fan was also thermally damaged but turned continuously when power was applied to the unit. The heater did not leak when submerged in water and a continuous supply of air was directed into the combustion chamber to pressurize the unit.

Propeller Examinations

The right and left propellers were examined at the manufacturer's facility in Wichita, Kansas. The blades of both propellers displayed bending, twisting, paint scuffing, and leading edge nicks consistent with a medium amount of rotational energy absorption during the impact sequence. The right propeller displayed a sheared latch screw arrowhead; the left propeller exhibited a dent in the cylinder near the feather end; these signatures were consistent with the blades operating on or near the low pitch stop position at impact.

## Medical and Pathological Information

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 11 of
46

WPR17FA066

The Sheriff-Coroner of the County of Riverside, Perris, California, conducted an autopsy on the pilot. The cause of death was listed as "multiple blunt impact injuries." The autopsy described an enlarged heart with 70% narrowing of the left anterior descending and right coronary arteries and 40% narrowing of the left circumflex artery. A blood sample taken by the coroner's office detected no drugs of abuse, alcohol, or carbon monoxide.

The FAA's Bioaeronautical Sciences Research Laboratory, Oklahoma City, Oklahoma, performed toxicology testing on specimens from the pilot, the front right seat passenger, and another passenger. The testing did not identify any drugs or ethanol in the samples that were provided for the pilot's toxicology, and the specimen provided was not sufficient for carbon monoxide analysis. The right front seat passenger's toxicology did not detect carbon monoxide. The other passenger's toxicology detected 21% carbon monoxide; the reason for the passenger's high carbon monoxide level is unknown.

## Tests and Research

### Right Engine Oil Analysis

A laboratory examination of a sample of the oil sludge found in the right engine revealed the presence of lead and bromine. According to an industry specialist, 100LL aviation gasoline (AVGAS) contains a compound known as tetraethyl lead (TEL), which acts as an octane booster for fuel. TEL decomposes to form lead oxide when the fuel is burned. To prevent electrically conductive lead oxide deposits from forming on the spark plugs, the lead scavenging agent ethylene dibromide is added to AVGAS and reacts with the lead oxide to form lead bromide. The lead bromide remains in the gas phase and exits the cylinder with the exhaust gas. It subsequently enters the oil with the blow-by gas and solidifies, thereby making up the sludge commonly found in aircraft engines.

## Administrative Information

| | |
|---|---|
| Investigator In Charge (IIC): | Stein, Stephen |
| Additional Participating Persons: | Anthony Wood; Federal Aviation Administration; Riverside, CA<br>Ricardo Hernandez; Federal Aviation Admnistration; Riverside, CA<br>Mike Council; Continental Motors, Inc.; Mobile, AL<br>Ricardo Asensio; Textron Aviation; Wichita, KS |
| Original Publish Date: | March 18, 2019 |
| Note: | The NTSB traveled to the scene of this accident. |
| Investigation Docket: | https://data.ntsb.gov/Docket?ProjectID=94780 |

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 12 of
46

The National Transportation Safety Board (NTSB), established in 1967, is an independent federal agency mandated by Congress through the Independent Safety Board Act of 1974 to investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. The NTSB makes public its actions and decisions through accident reports, safety studies, special investigation reports, safety recommendations, and statistical reviews.

The Independent Safety Board Act, as codified at 49 U.S.C. Section 1154(b), precludes the admission into evidence or use of any part of an NTSB report related to an incident or accident in a civil action for damages resulting from a matter mentioned in the report. A factual report that may be admissible under 49 U.S.C. § 1154(b) is available here.

# EXHIBIT B

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 2/22/2021 4:17 PM
Reviewed By: F. Miller
Case #19CV343789
Envelope: 5887999

John K. Crowley (State Bar No. 88189)
THE CROWLEY FIRM
125 S. Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 228-8100
Facsimile: (415) 228-9409
Email: jkc@gedlaw.com

Attorney for Plaintiff
RICHARD PIERCE

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| RICHARD PIERCE; SCOTT GARL, as successor-in-interest to the ESTATE OF STACEY PIERCE; BRANDON PIERCE; BLAINE PIERCE, by her Guardian Ad Litem; and BROOKE PIERCE, by her Guardian Ad Litem, | Case No.: 19CV343789 |
| Plaintiffs, | NOTICE OF MOTION AND MOTION OF PLAINTIFF RICHARD PIERCE FOR DETERMINATION OF GOOD FAITH SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | Date: March 11, 2021 |
| RAINCROSS FUEL & OIL, INC.; NOURI D. HIJAZI; ESTATE OF NOURI D. HIJAZI; ESTATE OF DANUTA HIJAZI; MARK SCHECK, as Personal Representative of the ESTATE OF NOURI D. HIJAZI; LORI SCHECK, as Personal Representative of the ESTATE OF NOURI D. HIJAZI; MONTEREY BAY AVIATION, INC. dba UNITED FLIGHT SERVICES; SERCO INC.; SERCO GROUP, PLC; DARRELL BLOOMER, an individual, and DOES 5 through 100, inclusive, | Time: 9:00 a.m. Dept.: 2 Honorable Drew Takaichi |
| | Trial Date: None Complaint Filed: February 25, 2019 |
| | [Cal. Civ. Proc. § 877.6(a)(1)] |
| Defendants. | |

TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR
ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 11, 2021, at 9:00 a.m., or as soon

7509705

thereafter as the matter may be heard in this Court, located at 191 North First Street, San Jose, California 95113, in Department 2, the Honorable Drew Takaichi presiding, plaintiff Richard Pierce (hereinafter "plaintiff"), by and through his attorney of record, The Crowley Firm, will move for an order determining that the settlement entered into between plaintiff and defendants Serco Inc. and Serco Group, Plc. (hereinafter "Serco Group") was made in good faith within the meaning of California Code of Civil Procedure Section 877.6(a)(1) on the grounds that the settlement was fair and reasonable under the facts and circumstances of this case and pursuant to the criteria set forth in *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, 38 Cal. 3d 488 (1985).

Pursuant to Civil Rule 3.1382, the parties affected by the settlement are plaintiff, Serco Inc., Serco Group and former Serco employee, Darrell Bloomer (hereinafter "Mr. Bloomer"). The pleading affected by the settlement is plaintiffs' first amended complaint, filed in this litigation on October 1, 2019.

This motion will be based upon this Notice of Motion and Motion for Determination of Good Faith Settlement; the Memorandum of Points and Authorities in support thereof and filed concurrently herewith; the Declaration of John K. Crowley in support thereof and filed concurrently herewith; the Declaration of Douglas F. Powers in support thereof and filed concurrently herewith; the Declaration of Wayne R. Sand in support thereof and filed concurrently herewith; all other papers, pleadings, and records on file herein; and upon such oral argument as may be heard at the time of hearing of this matter.

Dated: February 22, 2021

THE CROWLEY FIRM

By: _____
JOHN KEVN CROWLEY
Attorney for Plaintiff
**RICHARD PIERCE**

7509705

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This litigation arises from an accident which occurred after the accident aircraft (hereinafter "Aircraft") stalled shortly after taking off from the Riverside Municipal Airport (hereinafter "RAL") on February 27, 2017 (hereinafter "Accident"). At all material times, the air traffic control tower located at RAL was operated by Serco Inc. pursuant to a contract with the Federal Aviation Administration (hereinafter "FAA"). Plaintiffs' first amended complaint asserts wrongful death, negligence and survival claims against, *inter alia*, Serco Inc. and its parent company, Serco Group (hereinafter collectively referred to as "Serco").

As demonstrated below, the settlement entered into between plaintiff and Serco was made in good faith under California Code of Civil Procedure Section 877.6. The $███ settlement amount is fair and reasonable and well-within the ballpark of a reasonable settlement because Serco's proportionate liability for the Accident, if any, is insignificant and plaintiff's probable recovery from Serco is speculative. Specifically, the Accident was proximately caused by the accident pilot, Nouri Hijazi's (hereinafter "Pilot"), reckless operation of the Aircraft and his violation of federal regulations. Serco's former air traffic controller, Mr. Bloomer, complied with federal law and all applicable air traffic control rules when he cleared the Pilot to take off from RAL. The Accident was also proximately caused by improper Aircraft maintenance and the defective condition of the Aircraft.

Because the settlement was made in good faith, all claims against Serco Inc. and Serco Group for equitable contribution or comparative indemnity arising from the Accident are barred under Section 877.6(c). Thus, as further demonstrated below, Serco' motion for determination of good faith settlement should be granted.

## STATEMENT OF FACTS

### A.   *Accident Sequence*

On February 27, 2017, the Pilot and four passengers arrived at RAL

7509705                                                      -3-

Case: 21-50915   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 17 of
46
MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT

intending to fly from RAL to Norman Y. Mineta San Jose International Airport (hereinafter "the Flight"). *See* Declaration of John K. Crowley in Support of Motion For Determination of Good Faith Settlement of plaintiff (hereinafter "Crowley Decl."), ¶ 4, Exhibit B, p. 1. On the date of the Accident, instrument flight rules (hereinafter "IFR") conditions prevailed at RAL, including calm winds, visibility at 2 miles and light rain. *See* Crowley Decl., ¶ 4, Exhibit B, p. 6-7.

Prior to the Flight on the date of the Accident, the Pilot attempted to start the left engine of the Aircraft unsuccessfully on multiple occasions before that engine started. *See* Crowley Decl., ¶ 4, Exhibit B, p. 1. At 4:02 p.m., while the Aircraft was located on the ramp at RAL, the Pilot requested that Mr. Bloomer grant him an IFR clearance. *See* Crowley Decl., ¶ 4, Exhibit B, p. 2. Mr. Bloomer requested that the Pilot read back his IFR clearance and the RAL obstacle departure procedure (hereinafter "the ODP"). *See* Crowley Decl., ¶ 4, Exhibit B, p. 2. The Pilot required assistance from Mr. Bloomer when reading back the IFR clearance and the ODP. *See* Crowley Decl., ¶ 4, Exhibit B, p. 2. At 4:38 p.m., Mr. Bloomer cleared the Pilot to take off from RAL. *See* Crowley Decl., ¶ 4, Exhibit B, p. 2.

After taking off from RAL, the Aircraft stalled at approximately 1,500 feet above mean sea level and the Pilot was unable to recover control of the Aircraft after the stall occurred. *See* Crowley Decl., ¶ 4, Exhibit B, pp. 2-3; ¶ 6, Exhibit D, at p. 4. At 4:41 p.m., the Aircraft crashed in a residential area near RAL, resulting in the deaths of the Pilot and three passengers on board the Aircraft, including plaintiffs' decedent, Stacey Pierce. *See* Crowley Decl., ¶ 4, Exhibit B, p. 2-3.

**B.** *Accident Investigation*

The user manual for the Aircraft (hereinafter "the Manual") states that the maximum takeoff weight for the Aircraft is 5,500 pounds and that the forward center of gravity limit for the Aircraft is 38.67 inches. *See* Crowley Decl., ¶ 4, Exhibit B, at 3-4; ¶ 5, Exhibit C, at 4-1, 4-4, 4-6. According to the NTSB, at the time of the Accident, the total gross weight of the aircraft was 5,812 pounds, which

is 312 pounds over the maximum allowable gross weight of the Aircraft. *See* Crowley Decl., ¶ 4, Exhibit B, at 3-4. In addition, the NTSB determined that the center of gravity of the Aircraft was 36.82 inches, which exceeded the 38.67 inch center of gravity limit for the Aircraft. *See* Crowley Decl., ¶ 4, Exhibit B, at 4-5.

The Manual further states that the normal takeoff speed for the Aircraft is 115 to 140 knots. *See* Crowley Decl., ¶ 11, Exhibit I, Sec. 1-9. According to the NTSB, after taking off from RAL, the Aircraft reduced its speed from 95 knots to 87 knots and the aircraft was decelerating at the time of the stall. *See* Crowley Decl., ¶ 10, Exhibit H, at 3. After conducting an investigation regarding the Accident, the Federal Aviation Administration (hereinafter "FAA") concluded that the Accident was proximately caused by: (1) pilot induced error; (2) the Aircraft's center of gravity being outside of limits proscribed in the Manual; and (3) the Pilot's misuse of the Aircraft's controls. *See* Crowley Decl., ¶ 6, Exhibit D, at 1.

### C.   *Complaint and Judgement Liens*

Plaintiffs' first amended complaint (hereinafter "Complaint") alleges that the Pilot was not competent and/or mentally fit to operate the Aircraft on the date of the Accident. *See* Crowley Decl., ¶ 3, Exhibit A, at p. 6. The Complaint further alleges that Serco is responsible for the Accident because Mr. Bloomer breached a duty of care by issuing a takeoff clearance to the Pilot and/or by failing to prevent the Pilot from taking off from RAL. *See* Crowley Decl., ¶ 3, Exhibit A, at p. 6-11.

On May 21, 2020, plaintiff's creditor, Mezzetti Financial Services, Inc. (hereinafter "Mezzetti"), filed notices of liens (hereinafter "Lien Notices") in the above-captioned litigation (hereinafter "this Litigation"). *See* Crowley Decl., ¶ 12, Exhibit J. Mezzetti is asserting three liens in the total combined amount of US$42,251.62 (plus recoverable interest) against any settlement reached by plaintiff in this Litigation (hereinafter "Liens"). *See* Crowley Decl., ¶ 12, Exhibit J.

### D.   *Settlement Agreement*

On September 16, 2020, plaintiffs (including plaintiff Richard Pierce), Serco

Inc. and Serco Group attended a mediation before Mediator Harrison Sommer. *See* Crowley Decl., ¶ 13. The parties did not reach a settlement during the Mediation. *See* Crowley Decl., ¶ 13.[1] On December 23, 2020, plaintiff, Serco Inc. and Serco Group executed a Long-Form Settlement Agreement ("Settlement Agreement"). *See* Crowley Decl., ¶ 15. The Settlement Agreement did not involve the Other Plaintiffs. *See* Crowley Decl., ¶ 15. In the Settlement Agreement, Serco's insurers agreed to pay plaintiff $█████ in exchange for a release of all of plaintiff's claims against Serco Inc.; Serco Group; Mr. Bloomer; and the FAA, which arise out of or are related to the Accident or this Litigation (hereinafter "Settlement"). *See* Crowley Decl., ¶ 16. The Settlement is conditioned on the Court: (1) determining that the Settlement constitutes a good faith settlement pursuant to California Code of Civil Procedure Sections 877.6; and (2) authorizing the Settlement and determining the enforceability and recoverable amount of the Liens pursuant to California Code of Civil Procedure Section 708.440. *See* Crowley Decl., ¶ 17.

The Settlement Agreement states that the total amount of the Liens (hereinafter "Total Lien Amount") shall be determined by the Court when ruling on plaintiff's motion seeking an order regarding the Liens under Section 708.440, filed concurrently herewith. *See* Crowley Decl., ¶ 18. The Settlement Agreement also provides that Serco's insurers shall pay the balance of the settlement funds to plaintiff after paying the Total Lien Amount to Mezzetti. *See* Crowley Decl., ¶ 19.

## II

## THE SETTLEMENT WAS MADE IN
## GOOD FAITH UNDER CALIFORNIA LAW

### A. *Applicable Legal Standard*

California Code of Civil Procedure Section 877.6(a)(1) provides, in pertinent part, that: "[a]ny party to an action in which it is alleged that two or more parties

---

[1] After the mediation, on November 25, 2020, Serco Inc. and Serco Group reached a confidential settlement with plaintiffs Brandon Pierce, Bradley Pierce, Blaine Pierce, Brooke Pierce and the Estate of plaintiffs' decedent, Stacey Pierce (hereinafter collectively referred to as "Other Plaintiffs"). *See* Crowley Decl., ¶ 14.

are joint tortfeasors . . . shall be entitled to a hearing on the issue of the good faith of a settlement." Cal. Civ. Proc. Code § 877.6(a)(1). Section 877.6(b) authorizes a court to rule on motions for good faith settlement. *See* Cal. Civ. Proc. Code § 877.6(b). After a court determines that a settlement was reached in good faith, among other things, joint tortfeasors are, thereafter, barred from asserting equitable contribution or comparative indemnity claims against the settling defendant arising from the incident that was the subject of the lawsuit. *See* Cal. Civ. Proc. Code § 877.6(c). The party which is asserting that a settlement was not made in good faith bears the burden of proof on that issue. *See* Cal. Civ. Proc. Code § 877.6(d).

**B.** *The Settlement Was Made in Good Faith Under the Facts and the Law*

Although there is no precise yardstick for measuring the "good faith" of a settlement, the settlement must be within the "reasonable range" (within the "ballpark") of the settling defendant's share of liability for the plaintiff's injuries under the circumstances of a particular case. *See Tech-Bilt*, 38 Cal. 3d at 499-500.

In *Tech-Bilt*, the California Supreme Court identified a number of factors to be considered when determining whether a settlement was made in good faith, including: (1) a rough approximation of plaintiff's total recovery and the settler's proportionate liability; (2) the amount paid in settlement; (3) the allocation of settlement proceeds among different plaintiffs; (4) the fact that a settler should pay less in settlement than he would if he were found liable after a trial; (5) the financial condition and insurance policy limits of the settling defendant; and (6) the existence of collusion, fraud or other tortious conduct aimed to injure the interests of non-settling defendants (hereinafter "the *Tech-Bilt* factors"). *See id.* at 499.[2]

As demonstrated below, it cannot reasonably be disputed that the Settlement was made in good faith under the *Tech-Bilt* factors. Accordingly, this motion should be granted in its entirety.

//

---

[2] Because the Settlement was reached with a single plaintiff (Richard Pierce), the third factor of the *Tech-Built* test (*i.e.,* allocation of settlement funds between plaintiffs) is irrelevant in this case and, therefore, is not addressed in this motion.

7509705

### 1. Serco's Proportionate Liability to Plaintiff, If Any, Is Insignificant and Plaintiff's Probable Recovery From Serco is Speculative

Under the first *Tech-Bilt* factor, "the court is called upon to make a 'rough approximation' of what the plaintiff would actually recover [from a settling defendant]." *West v. Superior Court*, 27 Cal. App. 4th 1625, 1636 (1994). Where a defendant's proportionate liability to a plaintiff is insubstantial, a court can conclude that a plaintiff's probable recovery from the settling defendant is speculative. *See, e.g., Cahill v. San Diego Gas & Elec. Co.*, 194 Cal. App. 4th 939, 959-60 (2011). In *Cahill*, a defendant filed a motion for determination of good faith settlement after settling a lawsuit with the plaintiff. *Id.* at 944. When considering the first *Tech-Bilt* factor, the Court noted that "[the plaintiff's] lack of any viable theory of causation, and thus liability, against [the defendant] . . . would provide [plaintiff] little, if any, chance of recovery at trial." *Id.* at 964-65. The Court further observed that "[the plaintiff's] negligence was likely the primary, if not sole, cause of his injuries, thereby reducing, if not eliminating, his potential total recovery." *Id.* Therefore, in affirming the lower court's decision granting the motion, the court held that "a reasonable person could believe that [the defendant] had little, if any, potential liability for [the plaintiff's] injuries." *Id.* at 964-65.

Similar to *Cahill*, Serco contends that its proportionate liability for the Accident, if any, is insubstantial under the facts and law, for a number of reasons. First, the evidence establishes that the Accident was proximately caused by pilot error, including the Pilot's violation of federal regulations. *See* Declaration of Wayne R. Sand in Support of Motion For Determination of Good Faith Settlement of plaintiff ("Sand Decl."), at ¶¶ 35-36. Under federal law, the Pilot was required to comply with the operating limitations set out in the Manual and he was not permitted to operate the Aircraft in a careless or reckless manner. *See* 14 C.F.R. §§ 91.9, 91.13. In addition, the Pilot was prohibited from operating the Aircraft if the Aircraft was not in an airworthy condition and/or if he was not

competent or mentally fit to fly the Aircraft. *See* 14 C.F.R. §§ 61.53(a), 91.7(a).

The Pilot violated federal law by failing to comply with the Manual in the following respects: (1) the Aircraft was travelling at a speed of 87 knots when the stall occurred, which is well under the normal climb speed range specified in the Manual of 115 to 140 knots; (2) the Aircraft was 312 pounds over the Aircraft's maximum allowable gross weight; and (3) the Pilot exceeded the forward center of gravity limit for the Aircraft. *See* Crowley Decl., ¶ 4, Exhibit B, at 3-4; ¶ 5, Exhibit C, at 4-1; ¶ 11, Exhibit I, at 1-9; *see also* 14 C.F.R. § 91.9. The Pilot's decision to overload the Aircraft, his failure to evenly distribute weight within the Aircraft and his decision to decrease the Aircraft's speed to 28 knots below the normal climb speed for the Aircraft was careless and reckless and violated federal law. *See* Sand Decl., at ¶ 34; 14 C.F.R. § 91.13. In addition, the aircraft was unairworthy because, *inter alia*, its weight and balance exceeded proscribed limits, which violated federal regulations. *See* 14 C.F.R. § 91.7(a). If the Pilot was not competent or mentally fit to fly the Aircraft, he would have also violated federal law. *See* 14 C.F.R. § 61.53(a). Violation of these federal regulations is negligence *per se*. *See e.g., Rudelson v. United States*, 602 F.2d 1326, 1331 (9th Cir. 1979).

The stall of the Aircraft was proximately caused by the Pilot's negligent and reckless failure to ensure that the Aircraft was travelling at a speed which was sufficient to prevent a stall. *See* Sand Decl., at ¶ 35. In addition, the Accident was further caused by the Pilot's failure to follow basic, stall recovery procedures to regain control of the Aircraft after the stall occurred, despite there being sufficient time and altitude to safely implement these procedures. *See* Sand Decl., at ¶ 36. After conducting an investigation, the FAA found that the Aircraft stall was proximately caused by pilot error. *See* Crowley Decl., ¶ 6, Exhibit D, at 1.

Second, Mr. Bloomer did not breach a duty of care when he cleared the Pilot to takeoff from RAL. *See* Declaration of Douglas F. Powers in Support of Motion For Determination of Good Faith Settlement of plaintiff ("Powers

Case: 21-50915    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 14:20:02    Page 23 of 46

Decl."), at ¶ 17. Under federal law, air traffic controllers are required to comply with the rules included in FAA JO 7110.65W, entitled Air Traffic Control (hereinafter "the ATC Manual"). *See* 14 C.F.R. § 65.45. The ATC Manual requires controllers to ensure there is adequate spacing between aircraft taking off on runways. *See* Crowley Decl., ¶ 7, Exhibit E, Secs. 3-8-1, 3-9-6. The ATC Manual states that a takeoff clearance is "predicated on known traffic and physical airport conditions." See Crowley Decl., ¶ 7, Exhibit E, Glossary Section C. The ATC Manual further provides that a takeoff clearance does not need to be withheld when there is reasonable assurance that prescribed separation exists between aircraft located on the same runway. *See* Crowley Decl., ¶ 7, Exhibit E, Sec. 3-9-5. In addition, controllers are neither permitted, authorized nor given the discretion under the ATC Manual or federal law to withhold a takeoff clearance if they suspect that a pilot is not competent or mentally fit to fly. *See* Powers Decl., ¶ 11.

Mr. Bloomer did not violate the ATC Manual when he issued a takeoff clearance to the Pilot. *See* Powers Decl., ¶ 17 When he issued the takeoff clearance, there were no aircraft, vehicles or other objects located on the runway aside from the Aircraft. *See* Crowley Decl., ¶ 9, Exhibit G, at 4. Therefore, Mr. Bloomer had reasonable assurance that prescribed separation existed when he issued the takeoff clearance to the Pilot. *See* Powers Decl., ¶ 17; *see also* Crowley Decl., ¶ 7, Exhibit E, Sec. 3-9-5. As such, Mr. Bloomer was neither required, authorized nor given the discretion to refrain from issuing a takeoff clearance to the Pilot on the date of the incident. *See* Powers Decl., ¶ 17. In addition, Mr. Bloomer was neither required, authorized nor given the discretion under the ATC Manual to withhold a takeoff clearance even if he had suspected that the Pilot was not competent and/or the mental fit to operate the Aircraft. *See* Powers Decl., ¶ 18.

Air traffic controllers (including Mr. Bloomer) are neither required nor permitted to evaluate pilot competency or mental fitness under the ATC Manual because they are not qualified to make that determination. *See* Powers Decl., ¶ 12.

Mr. Bloomer could not observe the Pilot from the control tower and did not have access to information concerning the Pilots' flight history and experience or medical background. *See* Powers Decl., ¶ 12. Courts have consistently held that "[c]ontrollers are not required to foresee or anticipate the unlawful, negligent, or grossly negligent acts of pilots." *In re Air Crash at Dallas/Fort Worth Airport on Aug. 2*, 1985, 720 F. Supp. 1258, 1290 (N.D. Tex. 1989). Accordingly, Mr. Bloomer was not required to presume or anticipate that the Pilot would negligently operate the Aircraft and cause it to stall, in violation of many federal regulations. *See Biles v. United States*, 848 F.2d 661, 663 (5th Cir. 1988) ("Air traffic controllers cannot be presumed to have x-ray vision and extrasensory perception").

Had Mr. Bloomer withheld a takeoff clearance from the Pilot during the incident, he would have violated federal law, applicable ATC Manual provisions and deprived the Pilot of his due process rights. *See* Powers Decl., ¶ 30; *see also* Pilot Bill of Rights, Pub. L. No. 112–153, 126 Stat. 1159 (2012). Even if he had withheld a takeoff clearance from the Pilot, he could not have prevented the Pilot from taking off, as there are no procedures at RAL which he could have followed to prevent the Pilot from taking off from RAL. *See* Powers Decl., ¶ 20. In addition, even if Mr. Bloomer contributed to the Accident, courts have consistently held that negligent acts of air traffic controllers cannot be considered a proximate cause of an accident where an aircraft stalled and crashed due to a pilot's negligent conduct. *See, e.g., Turturro v. United States*, 43 F. Supp. 3d 434 (E.D. Pa. 2014).

Finally, plaintiff will establish that, in addition to the conduct of the Pilot, the Accident was also proximately caused by the defective condition of the Aircraft, as well negligent maintenance performed by aircraft maintenance entities.

Accordingly, just as in *Cahill*, Serco contends that, since its proportionate share of liability for the Accident (if any) is insubstantial, plaintiff's probable recovery from Serco is speculative. *See Cahill.*, 194 Cal. App. 4th at 959-60. Thus, even if Mr. Bloomer is found to have contributed to the Accident, Serco's

liability would be significantly reduced to account of the proportionate share of liability attributable to the Pilot and other defendants. Because Serco's liability to plaintiff is speculative, non-settling defendants have no basis to argue that they should be entitled to equitable contribution or comparative indemnity from Serco. *Id.* at 965 (holding that "a settling defendant generally cannot have any liability for equitable indemnity to a non-settling defendant if it has no liability to the plaintiff"). Therefore, this factor strongly weighs in favor of granting this motion.

### 2. *The Value of Serco's Consideration for the Settlement Agreement Is More Than Its Proportionate Share of Liability to Plaintiff, If Any*

To constitute a good faith settlement, the settlement amount must not be "grossly disproportionate to what a reasonable person . . . would estimate the settling defendant's liability to be." *Tech-Bilt*, 38 Cal. 3d at 499. Even a disproportionately low settlement is justified, however, when a plaintiff's probable recovery is speculative. *See, e.g., Cahill*, 194 Cal. App. at 965; *Kohn v. Superior Court*, 142 Cal. App. 3d 323, 328 (1983) (holding that "[a]lthough the sums paid may be grossly disproportionate to the sums prayed for in the complaint, they are not out of proportion to the probable recovery of plaintiffs").

Here, plaintiff agreed to settle his claims against Serco in exchange for Serco's insurers paying $███ to plaintiff. Serco contends that, in the absence of a viable causation theory and without sufficient evidence to prove that Mr. Bloomer was negligent or that he caused the Accident, a reasonable person would find that plaintiffs' probable recovery against Serco is insubstantial, if any. As such, the value of the payment to be made to plaintiff in the Settlement Agreement greatly exceeds Serco's proportionate share of liability for the Accident, if any. Therefore, the $███ settlement amount is well-within the ballpark of a reasonable settlement pursuant to Section 877.6. *See Cahill*, 194 Cal. App. at 965.

### 3. *Serco Should Pay Less in Settlement Than at Trial*

This *Tech-Bilt* factor invites the Court to apply the standard that "a settlor

should pay less in settlement than he would if he were found liable after a trial." *Tech-Bilt*, 3.8 Cal. 3d at 499. Here, Serco contends that the settlement amount is more than the liability exposure that it would reasonably have if this matter proceeded to trial. In *Cahill*, the appellate court reasoned that this "factor supports, rather than detracts, from the trial court's good faith settlement determination." 194 Cal. App. 4th at 968. Accordingly, because this *Tech-Built* factor can only support a finding that the Settlement was made in good faith pursuant to Section 877.6, this factor weighs in favor of granting this motion.

### 4. Serco's Financial Condition and Insurance Limit Are Irrelevant

*Tech-Bilt* does not require settling defendants to present evidence of their financial condition or liability insurance policy limits in order for a court to find that a settlement was made in good faith. *See, e.g., Cahill*, 194 Cal. App. 4th at 968. In *Cahill*, the appellate court reasoned that, because the settlement amount was reasonable without "discounting" the amount based on purported insolvency or insurance limitations, the factor "was irrelevant to the court's determination." *Id*. Accordingly, this factor can only serve to reduce, rather than increase, the amount which a Court would find to constitute a good faith settlement. *Id*. at 968.

Here, because Serco has agreed to pay more than its proportionate share of liability to plaintiff in settlement, it is unnecessary for the Court to consider Serco's financial condition and insurance policy limits in order to reduce the amount of its proportionate liability further. Furthermore, because its insurers are funding the Settlement, Serco's financial condition is irrelevant. *See* Crowley Decl., ¶ 16.

### 5. The Settlement Is Not the Product of Fraud, Collusion or Tortious Conduct

If a settlement agreement is the result of collusion between the settling parties, the settlement is not in good faith as a matter of law. *See Dillingham Const., N.A., Inc. v. Nadel P'ship, Inc.*, 64 Cal. App. 4th 264, 278 (1998). A settlement may be deemed collusive if it is not the result of "adverse negotiations

between parties with competing interests." *See Dillingham*, 64 Cal. App. 4th at 278. A court may apply a presumption of fairness when it finds that, among other things, a settlement was reached through arm's length bargaining by experienced counsel. *See, e.g., Dunk v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1802 (1996).

Here, the Settlement was consummated after three months of adverse negotiations by parties that are represented by experienced counsel and which have directly competing interests. *See* Crowley Decl., ¶ 21. There is absolutely no evidence that establishes, or even suggests, that plaintiff and Serco entered into the Settlement Agreement with the goal of injuring the interests of the non-settling defendants. *See* Crowley Decl., ¶ 21. In addition, because Serco's insurers would pay the balance of the settlement funds to plaintiff after paying the Total Lien Amount to Mezzetti, the parties are not colluding to enable plaintiff to avoid paying Mezzetti. Furthermore, because Serco has agreed to pay more than its proportionate share of liability in settlement, the Settlement does not harm the non-settling defendants. Therefore, this factor weighs in favor of granting this motion.

## CONCLUSION

Accordingly, for the foregoing reasons, the Court should grant this motion for determination of good faith settlement in its entirety and order that all claims against Serco Inc. and Serco Group for equitable contribution or comparative indemnity arising from the Accident are barred pursuant to Section 877.6(c).

Dated: February 22, 2021

THE CROWLEY FIRM

By: _____
JOHN KEVIN CROWLEY
Attorney for Plaintiff
**RICHARD PIERCE**

7509705

# EXHIBIT C

Filed
March 18, 2021
Clerk of the Court
Superior Court of CA
County of Santa Clara
19CV343789
By: fmiller

1  John Kevin Crowley (SBN 88189)
   **ATTORNEY AT LAW**
2  125 S. Market Street, Suite 1200
   San Jose, CA 95113-2288
3  Telephone: (408) 288-8100
   Facsimile: (408) 288-9409
4  E-mail: jkclaw@pacbell.net

5  Attorney for Plaintiff
   **RICHARD PIERCE**

6

7  **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
   **IN AND FOR THE COUNTY OF SANTA CLARA**
   **CIVIL DIVISION – UNLIMITED**

8

9  RICHARD PIERCE, individually and as
   successor-in-interest to the ESTATE OF
10 STACEY PIERCE, BRANDON PIERCE, an
   individual, BLAINE PIERCE, by her
11 Guardian Ad Litem, RICHARD PIERCE,
   BROOKE PIERCE, by her Guardian Ad
12 Litem, and BRADLEY PIERCE, an
   individual,
13              Plaintiffs,
14 vs.
15 RAINCROSS FUEL & OIL, INC.; NOURI D.
   HIJAZI a.k.a. NOUR D. HIJAZI; ESTATE
16 OF NOURI D. HIJAZI, a.k.a., ESTATE OF
   NOUR D. HIJAZI; ESTATE OF DANUTA
17 HIJAZI; MARK SCHECK, as Personal
   Representative of the ESTATE OF NOURI
18 HIJAZI; LORI SCHECK, as Personal
   Representative of the ESTATE OF NOURI
19 HIJAZI; MONTEREY BAY AVIATION, INC.
   dba UNITED FLIGHT SERVICES (DOE 1);
20 SERCO, INC. (DOE 2); SERCO GROUP,
   PLC (DOE 3); DARRELL BLOOMER, an
21 individual (DOE 4); MARSHA FISTEROLA,
   Trustee of the LARRY FISTEROLA AND
22 MARSHA FISTEROLA FAMILY TRUST
   (DOE 5); MARSHA FISTEROLA, as
23 Personal Representative of the ESTATE
   OF LARRY FISTEROLA (DOE 6);
24 CORPORATE AIR TECHNOLOGY (DOE
   7); STEVE FROST (DOE 8), an individual;
25 and DOES 9 through 100, inclusive,
              Defendants.
26

27

Case No.: 19CV343789

**ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS (CCP §708.440.)**

                    **11**
Date: March 4, 2021
Time: 9:00 a.m.
Dept.: 2
Judge: Honorable Drew Takahici

Complaint filed: 2/25/2019
Amended Complaint filed: 10/1/2019

28

ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT
AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS

Case: 21-50913   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 30 of
46

The motions for an order to determine good faith settlement and application of settlement funds to judgment liens filed by Richard Pierce came on for hearing in Department 2 of this Court on March 4, 2021 at 9:00 a.m.

Plaintiff Richard Pierce ("plaintiff" or "Pierce") has filed a motion for determination of good faith settlement. Assignee judgment creditor, Mezzetti Financial Services, Inc. ("MFS") has filed a motion to determine application of settlement funds to judgment liens. MFS's motion does not oppose the settlement entered, but requests an order for payment to MFS of the sums necessary to satisfy the assigned judgment liens from the settlement funds.

No party in the action has submitted opposition to plaintiff's motion for determination of good faith settlement. Hearing on the issue of good faith of settlement pertains to a settlement agreement between plaintiff Pierce and defendants, Serco Inc. and Serco Group, PLC ("settlement agreement"), pursuant to Code of Civil Procedure section 877.6. The parties affected by the settlement are plaintiff, Serco Inc., Serco Group, PLC ("Serco Group") and former Serco Group employee, Darrell Bloomer.

The settlement sum in the settlement agreement is subject to three judgment liens of MFS, as assignee, arising from three actions: Joel and *Dana Gambord Charitable Remainder Trust v. Richard Alan Pierce*, Santa Clara County Case No. 114-CV271994 ("*Gambord*"), *Drake Welding, Inc. v. Richard Alan Pierce dba Pierce Plumbing*, Santa Clara County Superior Court case no. 1-15-SC061067 ("*Drake*") and *USS Cal. Builders, Inc. v. Richard Pierce*, San Mateo County Superior Court case no. CIV538738 ("*USS*").

The settlement agreement is conditioned on the court determining that it constitutes a good faith settlement, and authorizing the settlement and determining the enforceability and recoverable amount of the judgment liens of MFS. Plaintiff, in his reply, does not contest the validity of MFS's lien for the *Gambord* judgment, the amount due as set forth in DFS' motion or the request of MFS for payment from the settling defendants from the settlement funds.

1

Case: 21-50515    Doc# 5-4    Filed: 07/09/21    Entered: 07/09/21 13:24:02    Page 31 of 46

1   Plaintiff contests the validity of the Drake and USS judgment liens, and hence,

2   payment to MFS for the same from the settlement funds. If the validity of the contested

3   judgments is not determined at this time, the parties agree to secure DFS' judgment liens

4   by withholding funds from distribution, pending disposition of Pierce's claims that the

5   Drake and USS judgments are invalid in whole or in part. Plaintiff does not address

6   whether he disputes MFS's calculation of the amount that should be withheld. MFS does

7   not provide copies of judgments with information to confirm the calculations.

8   Having read the motions, the points and authorities and declarations filed by the

9   parties and having issued a tentative ruling where no notice contesting the tentative ruling

10  was received or presented, the Court finds good cause to grant the motions.

11  IT IS HEREBY ORDERED that:

12  The motion for determination of good faith settlement is approved. All claims

13  against the Serco Group for equitable contribution or comparative indemnity arising from

14  the accident that is the subject of the lawsuit and settlement agreement are barred

15  pursuant to Code of Civil Procedure Section 877.6(c).

16  The Serco Group shall pay to MFS from the settlement funds, the *Gambord*

17  judgment in the amount of $47,275.40, plus interest at $10.51 per day after February 27,

18  2021, until paid.

19  The Court declines to issue ruling on the validity of the *Drake* and *USS* judgments.

20  Plaintiff and MFS shall file the appropriate motion and briefing in this action regarding

21  validity and enforceability of the *Drake* judgment which shall be filed and served 20 days

22  from date of this order at which time it shall be deemed submitted.

23  The court does not have jurisdiction to determine the validity of the *USS* judgment

24  which is vested with the San Mateo County Superior Court. Accordingly, the Serco Group

25  shall pay into court the sum of $62,424.60 pending resolution of MFS's liens for judgments

26  entered against plaintiff Pierce in *Drake* and *USS*.

27  Plaintiff shall take prompt action to determine the validity of the *USS* judgment,

28  filing the necessary motion in the San Mateo County Superior Court and providing notice

to the judgment creditor and assignee of record. Upon resolution of the validity of the judgments or failure to timely take action to resolve the issue, either party may set a motion with the court for distribution of the withheld funds.

The remaining proceeds from the settlement agreement be distributed to Richard Pierce.

IT IS SO ORDERED.

DATED: March 4, 2021

Signed: 3/12/2021 10:34 AM

_____

Honorable <u>Drew Takaichi</u>
Superior Court for the State of California
County of Santa Clara

ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT
AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS

# EXHIBIT D

Filed
April 8, 2021
Clerk of the Court
Superior Court of CA
County of Santa Clara
19CV343789
By: fmiller

1
John Kevin Crowley (SBN 88189)
**ATTORNEY AT LAW**

2
125 S. Market Street, Suite 1200
San Jose, CA 95113-2288

3
Telephone: (408) 288-8100
Facsimile: (408) 288-9409

4
E-mail: jkclaw@pacbell.net

5
Attorney for Plaintiff
**RICHARD PIERCE**

6

7
## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA CLARA
## CIVIL DIVISION – UNLIMITED

8

9
RICHARD PIERCE, individually and as successor-in-interest to the ESTATE OF STACEY PIERCE, BRANDON PIERCE, an individual, BLAINE PIERCE, by her Guardian Ad Litem, RICHARD PIERCE, BROOKE PIERCE, by her Guardian Ad Litem, and BRADLEY PIERCE, an individual,

Plaintiffs,

vs.

RAINCROSS FUEL & OIL, INC.; NOURI D. HIJAZI a.k.a. NOUR D. HIJAZI; ESTATE OF NOURI D. HIJAZI, a.k.a., ESTATE OF NOUR D. HIJAZI; ESTATE OF DANUTA HIJAZI; MARK SCHECK, as Personal Representative of the ESTATE OF NOURI HIJAZI; LORI SCHECK, as Personal Representative of the ESTATE OF NOURI HIJAZI; MONTEREY BAY AVIATION, INC. dba UNITED FLIGHT SERVICES (DOE 1); SERCO, INC. (DOE 2); SERCO GROUP, PLC (DOE 3); DARRELL BLOOMER, an individual (DOE 4); MARSHA FISTEROLA, Trustee of the LARRY FISTEROLA AND MARSHA FISTEROLA FAMILY TRUST (DOE 5); MARSHA FISTEROLA, as Personal Representative of the ESTATE OF LARRY FISTEROLA (DOE 6); CORPORATE AIR TECHNOLOGY (DOE 7); STEVE FROST (DOE 8), an individual; and DOES 9 through 100, inclusive, Defendants.

Case No.: 19CV343789

**AMENDED ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS (CCP §708.440.)**

Date: March 4, 2021
Time: 9:00 a.m.
Dept.: 2
Judge: Honorable Drew Takahici

Complaint filed: 2/25/2019
Amended Complaint filed: 10/1/2019

AMENDED ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH
SETTLEMENT AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS

1   The motions for an order to determine good faith settlement and application of
2   settlement funds to judgment liens filed by Richard Pierce came on for hearing in
3   Department 2 of this Court on March 4, 2021 at 9:00 a.m.

4       Plaintiff Richard Pierce ("plaintiff" or "Pierce") has filed a motion for determination of
5   good faith settlement. Assignee judgment creditor, Mezzetti Financial Services, Inc.
6   ("MFS") has filed a motion to determine application of settlement funds to judgment liens.
7   MFS's motion does not oppose the settlement entered, but requests an order for payment
8   to MFS of the sums necessary to satisfy the assigned judgment liens from the settlement
9   funds.

10      No party in the action has submitted opposition to plaintiff's motion for
11  determination of good faith settlement. Hearing on the issue of good faith of settlement
12  pertains to a settlement agreement between plaintiff Pierce and defendants, Serco Inc.
13  and Serco Group, PLC ("settlement agreement"), pursuant to Code of Civil Procedure
14  section 877.6. The parties affected by the settlement are plaintiff, Serco Inc., Serco Group,
15  PLC ("Serco Group") and former Serco Group employee, Darrell Bloomer.

16      The settlement sum in the settlement agreement is subject to three judgment liens
17  of MFS, as assignee, arising from three actions: Joel and *Dana Gambord Charitable*
18  *Remainder Trust v. Richard Alan Pierce*, Santa Clara County Case No. 114-CV271994
19  ("*Gambord*"), *Drake Welding, Inc. v. Richard Alan Pierce dba Pierce Plumbing*, Santa
20  Clara County Superior Court case no. 1-15-SC061067 ("*Drake*") and *USS Cal. Builders,*
21  *Inc. v. Richard Pierce*, San Mateo County Superior Court case no. CIV538738 ("*USS*").

22      The settlement agreement is conditioned on the court determining that it constitutes
23  a good faith settlement, and authorizing the settlement and determining the enforceability
24  and recoverable amount of the judgment liens of MFS. Plaintiff, in his reply, does not
25  contest the validity of MFS's lien for the *Gambord* judgment, the amount due as set forth in
26  DFS' motion or the request of MFS for payment from the settling defendants from the
27  settlement funds.

28

1

ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT
AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS

Plaintiff contests the validity of the Drake and USS judgment liens, and hence, payment to MFS for the same from the settlement funds. If the validity of the contested judgments is not determined at this time, the parties agree to secure DFS' judgment liens by withholding funds from distribution, pending disposition of Pierce's claims that the Drake and USS judgments are invalid in whole or in part. Plaintiff does not address whether he disputes MFS's calculation of the amount that should be withheld. MFS does not provide copies of judgments with information to confirm the calculations.

Having read the motions, the points and authorities and declarations filed by the parties and having issued a tentative ruling where no notice contesting the tentative ruling was received or presented, the Court finds good cause to grant the motions.

IT IS HEREBY ORDERED that:

The motion for determination of good faith settlement is approved. All claims against the Serco Group, Plc., Serco Inc. and Darrell Bloomer for equitable contribution and comparative indemnity arising from the accident that is the subject of the lawsuit and settlement agreement are barred pursuant to Code of Civil Procedure Section 877.6(c).

The Serco Group, Plc. and Serco Inc., shall pay to MFS from the settlement funds, the *Gambord* judgment in the amount of $47,275.40, plus interest at $10.51 per day after February 27, 2021, until paid.

The Court declines to issue ruling on the validity of the *Drake* and *USS* judgments. Plaintiff and MFS shall file the appropriate motion and briefing in this action regarding validity and enforceability of the *Drake* judgment which shall be filed and served 20 days from date of this order at which time it shall be deemed submitted.

The court does not have jurisdiction to determine the validity of the *USS* judgment which is vested with the San Mateo County Superior Court. Accordingly, Serco Group , Plc. and Serco Inc., shall pay into court the sum of $62,424.60 pending resolution of MFS's liens for judgments entered against plaintiff Pierce in *Drake* and *USS*.

Plaintiff shall take prompt action to determine the validity of the *USS* judgment, filing the necessary motion in the San Mateo County Superior Court and providing notice

to the judgment creditor and assignee of record. Upon resolution of the validity of the judgments or failure to timely take action to resolve the issue, either party may set a motion with the court for distribution of the withheld funds.

The remaining proceeds from the settlement agreement be distributed to Richard Pierce. After Serco Group, Plc. and Serco Inc. has paid $47,275.40, plus interest at $10.51 per day after February 27, 2021, to MFS and deposited with the Court $62,424.60, Serco Group, Plc. and Serco Inc. shall have no further obligation to pay any portion of the settlement funds to MFS.

IT IS SO ORDERED.

DATED: March 11, 2021

Signed: 3/23/2021 01:28 PM

_____
Honorable <u>Drew Takaichi</u>
Superior Court for the State of California
County of Santa Clara

3

ORDER ON PLAINTIFF RICHARD PIERCE'S MOTION TO DETERMINE GOOD FAITH SETTLEMENT AND APPLICATION OF SETTLEMENT FUNDS TO JUDGMENT LIENS

Case: 21-50915   Doc#153   Filed: 07/09/21   Entered: 07/09/21 16:20:02   Page 38 of 46

# EXHIBIT E

1    John Kevin Crowley (SBN 88189)
     **ATTORNEY AT LAW**
2    125 S. Market Street, Suite 1200
     San Jose, CA 95113-2288
3    Telephone: (408) 288-8100
     Facsimile: (408) 288-9409
4    E-mail: jkclaw@pacbell.net

5    Attorney for Cross-Defendant
     **RICHARD ALAN PIERCE dba PIERCE PLUMBING**

6

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    3/24/2021
By    /s/ Joel Lacey
       Deputy Clerk

7        **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **IN AND FOR THE COUNTY OF SAN MATEO**

9             **CIVIL DIVISION – UNLIMITED**

10

11

| | |
|---|---|
| PACE SUPPLY CORP., a California corporation, | Case No.: CIV528738 |
| Plaintiff, | **CROSS-DEFENDANT RICHARD ALAN PIERCE DBA PIERCE PLUMBING'S NOTICE OF MOTION AND MOTION IN EQUITY TO VACATE DEFAULT AND DEFAULT JUDGMENT AND TO DISMISS PURSUANT TO CODE OF CIVIL PROCEDURE SECTIONS 583.210 AND 583.250** |
| vs. | |
| SOUTH SAN FRANCISCO UNIFIED SCHOOL DISTRICT, ET AL., | |
| Defendants. | |
| USS CAL BUILDERS, INC., a California corporation, | Date: 5/7/2021<br>Time: 9:00AM<br>Dept.: 21<br>Judge: Hon. |
| Cross-Complainant, | |
| vs. | |
| RICHARD PIERCE dba PIERCE PLUMBING, ET AL., | |
| Cross-Defendants. | Complaint filed: 5/27/2014<br>X-Complaint filed: 8/11/2014 |

**TO ALL PARTIES AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on _____ 2021, at _____ a.m., or as soon thereafter as the matter may be heard, in Department ____, of the above titled Court located at 400 County Center, Redwood City, California, defendant Richard Alan Pierce dba Pierce Plumbing. ("Pierce"), specially appearing herein, will and hereby does request an order as follows: (1) in equity for an order vacating the defaults entered against him on October 15, 2014, and September 30, 2015, and the default judgment entered against him on October 29, 2015; and (2) for an order dismissing the action pursuant to Code of Civil Procedure Sections 583.210 and 583.250.

Pierce's Motion is made on the grounds that the Court was without jurisdiction to enter default and default judgment in that: (1) there was a complete failure to serve a summons and complaint on Pierce at any time or any manner as prescribed by the Code of Civil Procedure, and that the presently filed return of summons made on behalf of cross-complainant USS Cal Builders, Inc. is erroneous and/or false, and (2) that there has been a failure to file a valid proof of service of summons in accordance with Code of Civil Procedure Section 583.210, which requires dismissal of the action pursuant to Code of Civil Procedure Section 583.250.

Pierce's Motion is based upon this notice, the supporting memorandum of points and authorities, the supporting declaration of Richard A. Pierce, the supporting declaration of John Kevin Crowley, exhibits, and all of the records, files and pleadings in the Court's file, as well as the argument to be made at the time of hearing, and of those matters which may be judicially noticed.

Dated: March 23, 2021         By: _____
                                    JOHN KEVIN CROWLEY
                                    Attorney for Cross-Defendant
                                    Richard Alan Pierce dba Pierce Plumbing

NOTICE OF MOTION AND MOTION TO VACATE DEFAULT JUDGMENT

**PROOF OF SERVICE - [CCP SECTION 1013(a)3, 2015.5]**

      I, the undersigned, declare that I am now and at all times herein mentioned over the age of eighteen years, a resident of and employed in the County of Santa Clara, California, and not a party of the within entitled action or cause. My business address is 125 S. Market Street, Suite 1200, San Jose, CA., 95113.

      On the date indicated below, I served a true copy of the documents:

**Cross-DEFENDANT RICHARD ALAN PIERCE dba PIERCE PLUMBING'S NOTICE OF MOTION AND MOTION in Equity to Vacate Default and Default Judgment and to Dismiss Pursuant to Code of Civil Procedure Sections 583.210 and 583.250;**
**Cross-DEFENDANT RICHARD ALAN PIERCE dba PIERCE PLUMBING'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION in Equity to Vacate Default and Default Judgment and to Dismiss Pursuant to Code of Civil Procedure Sections 583.210 and 583.250;**
**DECLARATION OF JOHN KEVIN CROWLEY IN SUPPORT OF Cross-DEFENDANT RICHARD ALAN PIERCE dba PIERCE PLUMBING'S MOTION in Equity to Vacate Default and Default Judgment and to Dismiss Pursuant to Code of Civil Procedure Sections 583.210 and 583.250;** AND
**DECLARATION OF RICHARD A. PIERCE IN SUPPORT OF MOTION in Equity to Vacate Default and Default Judgment and to Dismiss Pursuant to Code of Civil Procedure Sections 583.210 and 583.250**

by electronic mail to the following:

Adam H. Meyers, Esq.
11030 Santa Monica Blvd., Ste. 109
Los Angeles, California 90025
ameyers@feldmanandassoc.com
*Attorney for lien holder, USS Cal builders, Inc.*
By electronic mail only

Carl Blaine, Esq.
Wagner, Kirkman, Blaine,
Klomparens & Youmans, LLP
1350 Treat Blvd. STE 400
Walnut Creek, California 94597
925-478-7308
916-920-5286
cblaine@wkblaw.com
*Attorney for Marsha Fisterola*

Wayne Chinloy, Pres.
Aircraft Exhaust Corporation
5485 NW 22nd Ave.
Fort Lauderdale, FL 33309
planexthaust@bellsouth.net
By electronic mail

Gary Gardner, Esq.
New York
Skinner Law Group
200 Broadhollow Road, Suite 207
Melville, NY 11747

Case: 21-50915   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 42 of 46

631-393-5024 direct
gardner@skinnerlawgroup.com
*Attorney for Riverside Air Service*
Served by email only

Tim Ryan, Esq.
The Ryan Law Group
400 Capitol Mall, Suite 2540
Sacramento, California 95814
tryan@ryanlg.com
*Attorney for Corp. Air Technology and Steve Frost*
Serve by email only

Rebecca Weisman, Esq.
Fleishman & Weisman, P.C.
79 Devine Street, Ste. 200
San Jose, California 95110
408-975-1073 Telephone
fwlawoffices.com
*Attorney for Scott Garl (Trustee)*
Served by email only

Garry L. Montanari, Esq.
Michaelis, Montanari & Johnson
4333 Park Terrace Drive, Suite 100
Westlake Village, California 91361
gmontanari@mmjaw.net
Served by email only

Louis J. Cutrone, Esq.
Cutrone & Associates
15260 Ventura Blvd., Suite 670
Sherman Oaks, California 91403
818-344-1732 Telephone
lou@cutronelaw.com
*co-counsel for plaintiff Richard Pierce*
Served by email only

Juliette Nguyen, Esq.
Aaron, Riechert, Carpol & Riffle, APC
333 Twin Dolphin Drive, Suite 350
Redwood City, California 94065
650-368-4662 Telephone
jnguyen@arcr.com
*Attorney: Guardian Ad Litem for Blaine Pierce and Brook Pierce*
Served by email only

Jose Mezzetti
79 Devine Street, Ste. 200
San Jose, California 95110
admin@mezzettifinancial.com
*Representative for Lien Holder*
Served by email only

Leslie Holmes, Esq.
Holmes & Usoz, LLP

Case: 21-50915   Doc# 5-4   Filed: 07/09/21   Entered: 07/09/21 14:20:02   Page 43 of 46

333 W. Santa Clara Street, Suite 610
San Jose, California 95113
408-292 7600 Telephone
HULawyers.com
*Attorney for Lien Holder*
Served by email only

Christian Johnson, Esq.
Senior Associate
CLYDE & CO
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
415-365-9800 Office
Christian.Johnson@clydeco.us
*Attorney for Serco Inc. and Serco Group PLC.*

X   Electronic mail as to those stated above

    (By U.S. Mail as to those stated above)  I am readily familiar with this office's business practice for collection and processing of correspondence for mailing with the United States Postal Service and that this document with postage fully prepaid will be deposited with the United States Postal Service this date in the ordinary course of business.
    I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at San Jose, California.

Dated: March 24, 2021                    S/Mariela Villarreal

                                         _____
                                         Mariela Villarreal

# EXHIBIT F

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**

STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Courthouse - Civil Division

FOR COURT USE ONLY

F I L E D

JUN 0 2 2021

Clerk of the Court
Superior Court of CA County of Santa Clara
BY_____ R. TIEN _____DEPUTY

PLAINTIFF/PETITIONER:

**RICHARD PIERCE et al.**

DEFENDANT/RESPONDENT:

**RAINCROSS FUEL & OIL, INC. et al.**

## NOTICE OF UNDOCUMENTED ACTION

CASE NUMBER:

**19CV343789**

Date: __6/2/2021_____

☐ $_____ Sanctions received from _____

☐ $_____ Bail received from _____

☐ $_____ Payment received for denied application for waiver of Court filing fees from

applicant/s_____

☐ $_____ Payment for complex fee designation received from party/s _____

_____

☐ $_____ Filing fee paid for _____

☐ Receipt from transfer returned and filed.

☑ Other: __$62,424.60 check deposited per 4/8/2021 Amended Order._____

_____

_____

_____

_____

_____

_____

_____

[ RESET FORM ]